Douglas E. Watts, SBN 182274
**WATTS LAW OFFICES**
1024 Iron Point Rd.
Folsom, CA 95630
Telephone: (916) 357-6517
Facsimile: (916) 404-5031
E-mail: dwatts@wattslaw-norcal.com

Attorneys for Plaintiff LESLIE ELOWSON

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE ELOWSON,<br><br>Plaintiff,<br><br>v.<br><br>JEA SENIOR LIVING; JOHN MCNEIL; JERRY ERWIN; CODY ERWIN; and DOES 1 through 50 Inclusive,<br><br>Defendants | **Case No. 2:14-cv-02559-JAM-KJN**<br><br>***FIRST AMENDED* COMPLAINT FOR DAMAGES:**<br><br>**1)** CONSPIRACY TO VIOLATE CIVIL RIGHTS LAWS, 42 USC §1985;<br>**2)** INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED); and<br>**3)** DEFAMATION<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, for her *First Amended Complaint,* alleges:

## PARTIES AND JURISDICTION

1. Plaintiff LESLIE ELOWSON is a 53-year-old married female, who, at all relevant times mentioned herein, resided and worked in Sacramento County, California. For purposes of her §1985 claims, Plaintiff is a member of protected categories based upon her gender, medical conditions, and taking of protected medical leave under the Family and Medical Leave Act ("FMLA"), 28 U.S.C. §2601, *et seq*.

2. Plaintiff alleges upon information and belief that Defendant JEA SENIOR LIVING ("JEA") is, and at all times relevant to this action was, a Washington state corporation which owned, operated, staffed, managed, and oversaw the Empire

-1-

Ranch Alzheimer's Special Care Center in Folsom, California ("ERASCC"), which regularly employed more than fifteen (15) persons in this jurisdiction, and was Plaintiff's employer.

3. Defendant JOHN MCNEIL ("McNEIL") is an individual over the age of 18 who, at all times relevant to this action, was JEA's VP of Operations and was Plaintiff's direct supervisor. Plaintiff alleges upon information and belief that MCNEIL is a resident of Washington state, and bears substantial culpability, along with his Co-Defendants, for Plaintiff's injuries and damages as set forth herein.

4. Defendant JERRY ERWIN ("J. ERWIN") is an individual over the age of 18 who, at all times relevant to this action, was JEA's Chief Executive Officer and was Plaintiff's direct supervisor. Plaintiff alleges upon information and belief that J. ERWIN is a resident of Washington state, and bears substantial culpability, along with his Co-Defendants, for Plaintiff's injuries and damages as set forth herein.

5. Defendant CODY ERWIN ("C. ERWIN") is an individual over the age of 18 who, at all times relevant to this action, was JEA's Chief Operations Officer and was Plaintiff's direct supervisor. Plaintiff alleges upon information and belief that C. ERWIN is a resident of Washington state, and bears substantial culpability, along with his Co-Defendants, for Plaintiff's injuries and damages as set forth herein.

6. There exists complete diversity of citizenship as between Plaintiff on the one hand, and the Defendants on the other, and Plaintiff seeks damages in excess of $75,000.00 in this action. Moreover, Defendants McNEIL, J. ERWIN, and C. ERWIN had frequent, substantial and systematic contacts with Plaintiff, as ERASCC's General Manager, both in this jurisdiction and in Washington state. Defendants (McNEIL in particular) made frequent, substantial visits to California to meet with Plaintiff and members of her staff, evaluate ERASCC's operations, and also to oversee other

businesses owned and/or operated by Defendants J. ERWIN and C. ERWIN. Defendants' purposeful, repeated and substantial contacts with this jurisdiction and availing of the laws, regulations, and protections of this jurisdiction make it proper for this Court to exercise personal jurisdiction over Defendants McNEIL, J. ERWIN, and C. ERWIN.

7. Plaintiff alleges upon information and belief that JEA's corporate executives and managing agents – including McNEIL, J. ERWIN and C. ERWIN – exercised substantial independent authority and judgment in their decision-making; thus, their decisions ultimately determined JEA's and ERASCC's personnel policies and procedures.

8. Jurisdiction is based upon both diversity of citizenship pursuant to 28 U.S.C. §1332, as well as subject matter pursuant to 42 U.S.C. §1985 and 28 U.S.C. §§1331; the Court has pendent jurisdiction under 28 USC §1367.

9. As to Plaintiff's state law causes of action for intentional infliction of emotional distress ("IIED") and defamation, this Court has supplemental jurisdiction under 28 U.S.C. §1367.

10. This Court also has jurisdiction over these Defendants in that they are corporate entities, individuals, and employers who, at all times relevant hereto, actively conspired to cause Plaintiff, on the basis of her protected categories, to be discriminated against, harassed, retaliated against, singled out, defamed, humiliated, and targeted for unfair and/or unlawful treatment in the workplace in violation of California law and Plaintiff's rights under the United States Constitution.

11. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 50 are unknown to Plaintiff, who therefore sues these Defendants by such fictitious names. Plaintiff will further amend this First Amended Complaint by inserting the true names and capacities of each such

Defendant when they are ascertained. Plaintiff alleges upon information and belief that an agency relationship exists between Defendants and DOES 1 through 50.

12. Plaintiff alleges upon information and belief that each of the Defendants designated herein as a DOE is in some manner responsible for the damages and injuries alleged in this Complaint.

13. Plaintiff alleges upon information and belief that each Defendant herein was, at all relevant times, the agent, representative, servant and employee of the remaining Defendants, and was acting at least in part within the course and scope of such relationship, and that the wrongful acts alleged herein were committed by such Defendants, and each of them. Moreover, Plaintiff alleges upon information and belief that Defendants and DOES 1 through 50 are engaged in a joint enterprise.

## BACKGROUND

14. Plaintiff worked at ERASCC as its Administrator from April 28, 2010 until November 2, 2012. On or about that date (Nov. 2, 2012), Plaintiff's supervisors conspired to, and did in fact, compel her to leave a job she and her family depended upon and at which she was very skilled, and did so in violation of Plaintiff's Civil Rights as guaranteed her under the United States Constitution.

15. As more fully set forth below, Plaintiff's termination from her Administrator position with ERASCC was wrongful and in violation of her Constitutionally protected rights, and followed months of conspiratorial, discriminatory and retaliatory actions taken against her by her employers and/or their managing agents on the basis of Plaintiff's gender (female), medical conditions, and lawful taking of protected leave under the FMLA and its companion state statutes.

16. Leading up to, and contemporaneously with, Plaintiff's termination from ERASCC, Plaintiff's supervisors – including but not limited to MCNEIL – made both express

and implied threats to harm Plaintiff's good reputation and her future employment prospects in her chosen healthcare field if she did anything other than leave her employment with ERASCC quietly on or about November 2, 2012.

17. Upon information and belief, Plaintiff alleges that within the last one (1) year prior to filing this action, Defendants, and each of them, made knowingly false, damaging statements about Plaintiff, her professional qualifications and abilities, how she performed her job duties while the Administrator at ERASCC, and how ERASCC functioned under Plaintiff's stewardship to third parties in the Folsom community, and in the broader field of geriatric healthcare providers. Defendants, including but not limited to McNEIL and C. ERWIN, told third parties that Plaintiff failed as ERASCC's Administrator, that ERASCC needed to rid itself of Plaintiff so that it could survive and remain in business, and that Plaintiff failed to meet revenue and other business objectives while she served as Administrator. These statements were false and not subject to any cognizable privilege when made.

18. Plaintiff, who has many years of experience in the field of geriatric health care administration, started with ERASCC when the community took in its first Alzheimer's resident-patients in August 2010. Under Plaintiff's stewardship, ERASCC exceeded all census expectations and opened to rave reviews from Alzheimer's patients and their families. Plaintiff, whom JEA paid as a salaried employee, received ongoing monthly bonuses due to ERASCC's patient census numbers and revenue generated. Plaintiff also received great reviews from others at the home office; this did not include McNEIL.

19. In or around October 2011, Plaintiff had the first of many serious surgical procedures on her jaw. She missed two weeks of work. ERASCC's business office manager was very concerned because, like Plaintiff, she felt no support from their supervisors. MCNEIL demanded that Plaintiff stay in touch with ERASCC and JEA while

she was home recovering. Plaintiff returned to work with her jaw wired shut and not feeling well; however, she performed all of her assigned duties and hit her bonus targets.

20. Six weeks after returning prematurely to work at ERASCC, Plaintiff was in extreme pain and went to a surgeon because the titanium plate in her mouth had broken in half. In spite of this huge health setback, Plaintiff continued to work for 4 days with a broken jaw due to pressure from her superiors, including MCNEIL and C. ERWIN. She then had to have emergency surgery, but took only two weeks off for the second surgery.

21. Plaintiff returned to work again after two weeks with her jaw wired shut only to have the screws loosen within six weeks because her jawbone had broken again. When Plaintiff told McNEIL that she needed to take FMLA leave to address her health issues, McNEIL, in threatening fashion, said "This is not good Leslie…;" also, "Is it necessary that you have this surgery now?" Plaintiff, fearing for her job, concluded that she had better return to work whether she wanted to or not. Again, fearing JEA would terminate her, Plaintiff worked again for a few days with a broken jaw until she could not take the pain and had another emergency surgery.

22. In early 2012, Plaintiff found out that she had an infection in her bones. Her doctors told her she would need a PIC line with IV therapy and hyperbaric oxygen treatments. She then missed eleven (11) weeks of work due to her illnesses and treatments. With the infection in her bones, Plaintiff's doctors felt that her life was potentially at risk unless she did all of the prescribed treatments.

23. At or about this time, Plaintiff filed for temporary state disability. She received a letter from Defendants stating that her FMLA leave was exhausted, and so Plaintiff returned to ERASCC. During the 11-odd weeks Plaintiff had been away from ERASCC, she heard nothing from McNEIL, J. ERWIN and C. ERWIN. In fact, Plaintiff never

-6-
***First Amended* Complaint For Damages –** *Elowson v. JEA Senior Living, et al.***; Case No. 2:14-cv-02559-JAM-KJN**

asked for any type of special treatment at all, returning to her Administrator's position at full duty, working 10-plus hours a day. Although Plaintiff's doctors recommended that she stay out longer for health reasons, Plaintiff refused, fearing retaliation from her employers.

24. On the day that Plaintiff returned to ERASCC, her department heads asked "What are you doing here?" ERASCC's staff told Plaintiff that they were under the impression that she would **not** be returning. These department heads believed that "Kim," a woman who had worked for a different JEA building that had just sold, was going to be their new boss. Plaintiff was still physically ill and now an emotional wreck after hearing this within 10 minutes of returning. Fearing that she had been terminated or replaced while out on temporary disability leave, Plaintiff frantically called McNEIL, texted him, and emailed him, leaving messages anywhere and everywhere for him. McNEIL did not return Plaintiff's calls for three days. When Plaintiff finally reached McNEIL, she asked him if he had offered her job to someone else. McNEIL denied doing so. He said that "Kim" was no longer with the company; however, Plaintiff alleges upon information and belief that this was a lie, and that "Kim" was still employed with JEA.

25. From the time Plaintiff came back to ERASCC, she could do no right in Defendants' eyes. She was very soon put on a plan of correction for things that had happened to the ERASCC building during her absence. Plaintiff would call for support only to not have calls/emails returned for up to five days. Prior to Plaintiff's illness and use of protected leave, McNEIL had never written her up for how she was running the building, nor had he been conducting the mandatory monthly financial calls with the community Administrator that McNEIL was supposed to be having.

26. Between May 2012 and October 2012, Defendants' only feedback, comments, and attention to Plaintiff's work was negative. When she had corrected all

-7-
**FIRST AMENDED** COMPLAINT FOR DAMAGES – *ELOWSON V. JEA SENIOR LIVING, ET AL.*; CASE NO. 2:14-CV-02559-JAM-KJN

issues on Defendants' plan of correction, she never heard back from any of her supervisors. Plaintiff sent McNEIL back a list of substantial achievements she had completed under difficult circumstances. When Plaintiff asked why McNEIL refused to acknowledge her successes, he stated he wasn't going to thank Plaintiff for doing her job.

27. Following Plaintiff's return from protected leave, McNEIL – much to Plaintiff's chagrin and concern – made a point to include JEA's Human Resources/ Employee Relations department whenever he spoke with Plaintiff by phone. This was something Defendants had never done before.

28. On or about July 4, 2012, Plaintiff learned that while she was out of work on protected disability leave, Defendants had indeed offered her Administrator's job to "Kim," in direct contrast to what McNEIL had earlier stated. After that day, Plaintiff discovered that multiple people knew of the job offer to Kim. Plaintiff called McNEIL once again to see if JEA had offered Kim her job; McNEIL's only response was to laugh at Plaintiff. Then, he stated that Kim was no longer with the company. In fact, Plaintiff learned, Kim was working at another JEA building outside of California until Plaintiff's Administrator's position became available.

29. Plaintiff wrote a letter to JEA's owner J. ERWIN with her concerns about McNEIL's treatment of her in August of 2012. J. ERWIN called Plaintiff in response, telling her that McNEIL was "immature" in the way he handles things and that he (Defendant J. ERWIN) had "heard all of this before." J. ERWIN also told Plaintiff to "hang in there."

30. At or near this time (summer 2012), Plaintiff – who long had known that JEA's upper management was a cabal of mostly males like McNEIL, J. ERWIN and C. ERWIN – realized that JEA was showing blatant favoritism to a similarly situated male employee, while showing no sympathy for her, and in fact, conspiring to replace her as

-8-

ERASCC's Administrator without good cause. JEA gave this male individual "Jerry" all sorts of leeway and concessions during his illness. In fact, Jerry (now deceased) told Plaintiff that JEA was "so great" in the way that they treated him following his illness, and that the company was "understanding and sympathetic." Plaintiff received no such treatment from these Defendants.

31. Upon information and belief, Plaintiff alleges that while Defendants were ***demanding*** that Plaintiff keep in contact with JEA and McNEIL while off on protected leave for a serious, life-threatening health crisis, while they were ***demanding*** that she return to full-duty work instead of getting medical treatments she needed, and while they were conspiring to unlawfully terminate Plaintiff while she was out on FMLA leave and lying to her face about it, these same Defendants were bending over backward to support "Jerry," the male supervisor who worked for JEA's construction company who also had fallen ill. Fearing reprisals from McNEIL and JEA, Plaintiff did not voice her complaints about gender discrimination to these Defendants.

32. Plaintiff alleges upon information and belief that after her August 2012 conversation with J. ERWIN, J. ERWIN spoke with McNEIL, informed him of Plaintiff's complaints, and that the two then discussed ways in which Defendants could terminate Plaintiff's employment.

33. When Plaintiff told McNEIL that he was punishing Plaintiff for things that had happened in her absence from ERASCC, McNEIL asked Plaintiff: "How long are you going to use your health as an excuse?" These comments to Plaintiff were undeserved, deeply hurtful and distressing.

34. Plaintiff alleges upon information and belief that during Plaintiff's absence, McNEIL called Plaintiff's department heads and support staff and encouraged them to call McNEIL with any and all concerns and complaints about Plaintiff. Never in all of

Plaintiff's years working in healthcare facilities had she been subjected to this type of complaint *solicitation* from her direct supervisor. In fact, Plaintiff discovered that McNEIL was even taking complaints from employees that had been counseled by Plaintiff for not properly doing their jobs at ERASCC.

35. Plaintiff alleges upon information and belief that Defendants, and each of them, took these actions in furtherance of Defendants' conspiratorial plan to terminate Plaintiff for taking what McNEIL viewed as "excuse" leave, instead of necessary, protected sick leave, all the while favoring male employees such as the construction manager mentioned above.

36. Plaintiff had earned performance-based bonuses every month since the ERASCC building opened. She even received a bonus when she was off for her third surgery based upon her annual numbers back in spring of 2012. Once she returned and Defendants had placed her on a bogus "plan of correction," Defendants never bonused Plaintiff again. Plaintiff asked McNEIL if he would reconsider the bonus structure since the building did not do a move-in during her absence; rather, there had been only patient move-outs. McNEIL laughed in Plaintiff's face, telling her no. He also said "Why should (Plaintiff) get special treatment?"

37. Following Plaintiff's return from protected disability leave, she was working twice as hard – while still recovering physically and emotionally – and making significantly less money.

38. At or near the end of October, 2012, McNEIL called Plaintiff and essentially forced her to resign. Plaintiff asked if she had a choice and McNEIL said no, stating that he would allow Plaintiff to say she was leaving due to illness.

39. Plaintiff's final day of employment with Defendants was Friday, Nov 2, 2012. By Tuesday of the following week, the aforementioned "Kim" – whom McNEIL had

repeatedly told Plaintiff was no longer with the company – was announced to be the new administrator at ERASCC.

**FIRST CAUSE OF ACTION**
[Conspiracy To Violate Civil Rights Laws – 42 USC §1985(3)]

40. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 39 of this Complaint as though fully set forth herein.

41. Pursuant to 42 U.S.C. §1985(3), liability shall arise "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws..."

42. As described herein, Defendants, while acting in concert and under an implied or oral agreement to deprive Plaintiff of her civil rights, took adverse employment actions against Plaintiff, as alleged above, based upon her protected categories including but not limited to her gender, medical conditions, and use of protected disability leave.

43. Defendants, while acting in concert an in furtherance of a preconceived plan, wrongfully and intentionally discriminated against, harassed, and retaliated against Plaintiff because of her protected categories; thus, Defendants treated Plaintiff in an unequal and unfair manner without any rational or legitimate basis.

44. As a direct and proximate result of Defendants' acts, Plaintiff has suffered compensatory damages, loss of past and future earnings, loss of dignity, great humiliation, and emotional injuries manifesting in physical illness and mental anguish.

45. Defendants' actions have caused and continue to cause Plaintiff to incur legal expenses and attorneys' fees. Plaintiff is presently unaware of the precise amount of such expenses and fees, and prays leave of court to amend this Complaint when those amounts are more fully known.

## SECOND CAUSE OF ACTION
[IIED – as to all Defendants]

46. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 45 of this Complaint as though fully set forth herein.

47. Defendants' actions toward Plaintiff for taking time off work for legitimate, even life-threatening illnesses, and for utilizing protected disability leave, and also subjecting her to unfair scrutiny, undeserved discipline, rude treatment, and insults constitute outrageous conduct toward Plaintiff.

48. Defendants committed, or acted in concert to commit, acts which were intended to cause Plaintiff to suffer extreme emotional distress, worry, and job-related anxiety. Alternatively, Defendants engaged in the conduct with reckless disregard for the probability that their concerted, conspiratorial actions would cause Plaintiff to suffer emotional distress.

49. Plaintiff did, indeed, suffer severe emotional distress as a result of Defendants' outrageous conduct.

50. As a proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain losses in earnings and other employment benefits.

51. As a proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

52. Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an

-12-
*First Amended* Complaint For Damages – *Elowson v. JEA Senior Living, et al.*; Case No. 2:14-cv-02559-JAM-KJN

improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights. Because the acts taken toward Plaintiff were carried out by Defendants acting in concert, and in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage Plaintiff, she is entitled to recover punitive damages in an amount according to proof.

### THIRD CAUSE OF ACTION
[Defamation – as to all Defendants]

53. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 52 of this Complaint as though fully set forth herein.

54. As alleged above, Plaintiff is informed and believes and thereon alleges that within the last one (1) year before filing this action, Defendants stated to Defendants' employees, members of the Folsom community, and other professionals within Plaintiff's field of geriatric healthcare, orally and in writing, that Plaintiff possessed poor professional qualifications and abilities, that she failed to adequately perform her job duties while the Administrator at ERASCC, and that ERASCC functioned at a low level under Plaintiff's stewardship. These statements are false and Defendants knew or should have known them to be false at the time they were made. Additionally and/or alternatively, Defendants acted with reckless disregard for the truth at the time these statements were made. Plaintiff is informed and believes and thereon alleges that Defendants republished these false and defamatory statements, orally and in writing, to persons who were both employed and not employed by Defendants, resulting in further damage to Plaintiff's reputation.

55. Defendants' conduct constituted libel and slander and violated California Civil Code sections 44, 45, and 46. Section 45 provides that "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or

which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Section 46 provides that "[s]lander is a false and unprivileged publication, orally uttered...which: (1) Charges any person with crime . . . [or] (3) Tends directly to injure [plaintiff] in respect to [her] office, profession, trade or business...by imputing to [her] general disqualification in those respects which the office or other occupations peculiarly requires, or by imputing something with reference to [her] office, profession, trade, or business that has a natural tendency to lessen its profits."

56. As a proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain losses in earnings and other employment benefits.

57. As a proximate result of Defendants' conduct, Plaintiff has been compelled to incur obligations as and for medical and psychological services, medicines, hospitalization, and medical supplies and will in the future be compelled to incur additional obligations therefore; Plaintiff does not at this time know the reasonable value thereof, but prays that the same may be inserted herein when ascertained.

58. As a proximate result of defendants' conduct, Plaintiff has suffered and continues to suffer damages to her reputation, humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in an amount according to proof.

59. Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights. Because the acts taken towards Plaintiff were carried out by Defendants acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage Plaintiff, she is entitled to recover punitive damages in an amount according to proof.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendants, and each of them as follows:

1. For economic damages in an amount according to proof;
2. For general damages in an amount according to proof;
3. For punitive damages;
4. For costs of suit, including but not limited to reasonable attorneys' fees;
5. For prejudgment interest in an amount according to proof;
6. For such other and further relief as the court may deem proper.
7. <u>Plaintiff demands a trial by jury.</u>

Dated: Feb. 9, 2015　　　　　　　　　　**WATTS LAW OFFICES**

　　　　　　　　　　　　　　　　　　　　/s/ Douglas E. Watts
　　　　　　　　　　　　　　　　　By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　Douglas E. Watts, Esq.
　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiff